Cheshire
No. 2001-082

## VINCENT AND CAROL MALNATI

v.

## THE STATE OF NEW HAMPSHIRE & a.

Argued: March 13, 2002
Opinion Issued: July 23, 2002

*Faulkner, Plaut, Hanna, Freund & Worthen, P.C.*, of Keene (*George R. Hanna* and *Mary Louise Caffrey* on the brief, and *Ms. Caffrey* orally), for the plaintiffs.

*Philip T. McLaughlin,* attorney general (*Craig S. Donais,* assistant attorney general, on the brief and orally), for the defendants.

*Baldwin, Callen, Hogan & Kidd, P.L.L.C.,* of Concord (*Jed Callen* on the brief) for Rails-to-Trails Conservancy, as *amicus curiae.*

NADEAU, J. The State appeals decisions of the Superior Court (*Brennan,* J.) holding that RSA 228:60-a, V (1993) violates the rights of the plaintiffs, Vincent and Carol Malnati, to due process and equal protection under the New Hampshire Constitution. *See* N.H. CONST. pt. I, arts. 12, 15. The State also challenges both the trial court's failure to clarify its ruling that the easement acquired by the State over the plaintiffs' property was for railroad purposes only, and the court's ruling that use of the rail corridor as a recreational trail materially increased the burden on the servient estate. Finally, the State appeals the trial court's order granting attorney's fees to the plaintiffs. The plaintiffs cross-appeal, challenging rulings that the State could not abandon the easement as a matter of law and had not abandoned the easement as a matter of fact. We reverse.

The following facts were found by the trial court or agreed upon by the parties. The plaintiffs own property on which they operate a dairy farm in Walpole. In 1846, the State acquired through eminent domain a railroad easement through the property now owned by the plaintiffs. There has been no rail activity on the easement for more than twenty-five years, and the railroad bed is now overgrown.

In 1981, the legislature enacted RSA 228:60-a. *See* RSA 228:60-a (1993). Section V of that statute, as amended, provides:

> All railroad rights of way and rail properties acquired by the commissioner or by the state are hereby declared to be owned in fee simple absolute. Any and all reversionary rights in railroad rights-of-way and rail properties which have been acquired by the state or are acquired by the commissioner by purchase, condemnation or otherwise are hereby declared extinguished as of June 18, 1991, or the date of acquisition, whichever occurs later. The commissioner shall give notice to the public of all such properties declared under this paragraph to be owned in fee simple absolute by the state by publishing a description of the properties sufficient for the identification thereof, specifying the county where the properties are located. Any such notice shall be published at least once each year for 2 years in a newspaper of general circulation in the county where the property is located. Any person damaged thereby may make claim by petition against the commissioner to the

appropriate superior court within 5 years of the date of acquisition or declaration of fee simple absolute ownership. The petition shall then be referred to the board of tax and land appeals, which shall proceed as with a condemnation under RSA 498-A. The right to appeal contained in RSA 498-A:27 shall be available to the claimant or the commissioner.

Pursuant to the statute, the department of transportation published notice in a newspaper of general circulation in Cheshire County, the county in which the plaintiffs' land is located, on December 5, 1997, and on January 10, 1998, declaring ownership in fee simple absolute of "[a]pproximately 42 miles of so-called 'Cheshire Branch.'" The published notice reached the plaintiffs, who, on January 22, 1998, filed a petition in superior court for damages pursuant to RSA 228:60-a, V. In July 1998, the plaintiffs commenced this action by filing a separate petition to quiet title in superior court. The petition for damages was held in abeyance pending the superior court's decision in the action to quiet title.

The trial court ruled that the purported taking of the plaintiffs' property violated their due process and equal protection rights under the State Constitution, and concluded that "the State of New Hampshire has no rights in the Malnati farmland underlying the railroad easement." This appeal and cross-appeal followed.

We first address the plaintiffs' contention, on cross-appeal, that the trial court erred in holding that the easement over their property had not been abandoned. The plaintiffs' position is that prior to the enactment of RSA 228:60-a, V, the State's easement had terminated by abandonment, leaving their property no longer encumbered. Thus, by the time RSA 228:60-a, V was enacted, there was no right-of-way on their property to be subject to declaration of fee simple ownership under the statute, and, therefore, RSA 228:60-a, V created no State interest in their property.

The trial court ruled that the State could not, as a matter of law, lose an easement by abandonment. We agree. "Because the State's rights in land are not always enforced and protected with the same vigilance as private rights, the legislature has determined that no person can acquire title to State lands by adverse possession." *State v. Tallman*, 139 N.H. 223, 225-26 (1994); *see* RSA 539:6 (1997). "For the same reason it has been decided that the State does not forfeit or lose its rights to public lands and waters by laches, estoppel or waiver." *Moultonboro v. Crumb*, 114 N.H. 26, 28 (1974). We see no reason why the same rule should not apply to abandonment.

The plaintiffs attempt to distinguish the foregoing cases by confining them to "public lands," which, the plaintiffs argue, "include only such lands

as are owned by the State and held and maintained for public use, open to such use by any and every member of the public." The plaintiffs assert that railroad easements, on the other hand, vest exclusive rights of use and occupation in the railroad, not the public. "That rail service is a 'public purpose,'" the plaintiffs argue, "does not transform a railroad easement into public lands" subject to the rule of *Tallman* and *Crumb*.

We reject the plaintiffs' initial premise that the rule of *Tallman* and *Crumb* applies only to public property such as parks, *see Crumb*, 114 N.H. at 27-28, and public waters, *see State v. Stafford Company*, 99 N.H. 92, 97 (1954). The State's interest in *Tallman* was an easement that allowed the State to flood the private landowner's property during times of high water. *See Tallman*, 139 N.H. at 224. The rule that the State cannot lose its interests in property by abandonment applies with equal force to the easement at issue here. Accordingly, we agree with the trial court's decision on this issue.

The plaintiffs further argue that the State's easement was extinguished when the railroad ceased using the right-of-way and the State failed to resume its rights to the corridor under Laws 1844, 128:10 (the 1844 statute). The 1844 statute provided, among other things, for the laying out of railroad routes by the State railroad commissioners, the assessment of damages sustained by the owners of land over which the routes passed, and the leasing by the State to railroad corporations for a lease term of "not less than one hundred years, nor more than two hundred years, the right to construct a railroad over said route, for the public use and benefit, with the right of user in the same to pass and repass with their locomotives, cars and vehicles of transportation thereon." Laws 1844, 128:8; *see* Laws 1844, 128:5. The statute further provided that at the expiration of the lease term, "the right so leased shall revert to the State." Laws 1844, 128:8. It also provided that the lease may be renewed. *Id.* The railroad corporation was required, upon execution of the lease, to deposit with the State treasurer the amount assessed as damages for the laying out of the route. Laws 1844, 128:9. Finally, section 10 of the 1844 statute provided:

> The State may, at any time after twenty years, resume the right and privilege of the corporation in such railroad, on giving one year's notice and paying to the corporation all it may not have received of its expenditures, and interest on such expenditures, at the rate of ten per cent. per annum.

The plaintiffs argue:

> Clearly, under the statute, while the State initially took the railroad interests by eminent domain, whatever those interests might have been, it conveyed to the railroad everything that it had taken, with the possibility of reverter to the State upon the condition of payment as required to the railroad, whether upon nonrenewal of the lease at its expiration or upon earlier notice of intent to take back the rights and privileges of railroad use.

Because the State failed to take affirmative action to "resume its contingent rights," the plaintiffs contend, its easement over their land was extinguished. We disagree. The 1844 statute, by its terms, provides for a lease, not a wholesale conveyance, of the right to build and operate a railroad line over the routes laid out by the State. Section 10 of that statute merely gives the State an early termination option. It does not require any affirmative action by the State to maintain its interest in the routes or to exercise a right of reverter. The statute clearly provides that the leased right, if not earlier resumed by the State under its termination option, automatically reverts to the State upon expiration of the lease term. We conclude that the State's easement was not extinguished through failure to "repossess" it from the railroad.

■ In ruling on the plaintiffs' due process claim, the trial court held that "notice by publication is insufficient to satisfy the standards for due process under the New Hampshire Constitution when applied to a property owner who will be significantly affected by the State's action." The State argues, however, that the plaintiffs lacked standing to challenge the form of notice under the statute because they received actual notice through the State's newspaper publication. We agree. "In evaluating whether a party has standing to sue, we focus on whether the plaintiff suffered a legal injury against which the law was designed to protect." *Lake v. Sullivan*, 145 N.H. 713, 716 (2001) (quotation omitted). Here, the plaintiffs suffered no injury due to the alleged deficiency in the notice procedure because they had actual notice. They therefore lack standing to challenge the notice provisions of RSA 228:60-a, V. *Cf. Appeal of Catholic Medical Center*, 128 N.H. 410, 413 (1986). Accordingly, we reverse the trial court's holding on that issue.

The State next challenges the trial court's equal protection ruling. "The first question in an equal protection analysis is whether the State action in question treats similarly situated persons differently." *Nutbrown v. Mount Cranmore*, 140 N.H. 675, 681 (1996) (quotation omitted). The trial court found that the plaintiffs were "similarly situated with other New Hampshire landowners subject to public projects under the State's power of eminent domain," but that they were treated differently because other

landowners are entitled to specific notice and a pre-taking hearing on the necessity of the taking.

The State argues that the property owners whose land is declared to be owned by the State in fee simple under RSA 228:60-a, V are not similarly situated with other landowners whose land is subject to taking for other public uses, and that the statute satisfies equal protection requirements because all owners of property burdened by railroad rights of way are treated similarly, while all owners of non-railroad property subject to taking are likewise treated similarly. Specifically, the State argues, quoting *Polk v. Ball*, 149 F.2d 263, 267 (5th Cir. 1945):

> [T]he grant of a right-of-way for railroad purposes ordinarily vests in the railroad company virtually exclusive possession of the property over a long term of years, depriving the grantor, for all practical purposes, of all dominion over the property; hence, the property right remaining in the vendor has little or no value.

We find the State's reasoning unpersuasive. While the fee holders of heavily burdened property may be entitled to minimal compensation for the taking of that fee, they are not differently situated with respect to the taking itself than the owners of more valuable, unburdened fees. We follow our holding in *Gazzola v. Clements*, 120 N.H. 25, 29 (1980), that "persons whose land is about to be taken *by the State* are 'similarly situated.'"

We now turn to the second question in the equal protection analysis, which is "whether the classification created by the statute is justifiable. The standard used to answer this question depends on the rights affected by the statute." *Nutbrown*, 140 N.H. at 682. The State urges us to apply middle-tier scrutiny, as in zoning cases. We decline, however, to overrule settled law. We have previously held, in addressing the procedural safeguards afforded persons whose property is subject to taking by the State, that "ownership, use and enjoyment of private property in general is a 'fundamental personal right' under the New Hampshire Constitution." *Gazzola*, 120 N.H. at 30. State statutes affecting such fundamental rights "are subjected to strict judicial scrutiny with the result that there must be a compelling state interest to sustain the legislation." *Id.* (quotation omitted).

Having determined that the plaintiffs do not have standing to challenge the notice provisions of the statute, we need not address their equal protection claims as to those provisions. Thus, the only equal protection issue remaining concerns the lack of a pre-taking hearing. The trial court held that the State constitutional requirement of equal

protection entitled the plaintiffs to a pre-taking hearing on the issue of necessity, "similar to the hearings provided to other landowners for other New Hampshire projects." We disagree. RSA 228:60-a differs from other eminent domain statutes we have examined in an equal protection context in that it does not authorize a condemnor to make an initial determination that an occasion for the taking exists. *Cf., e.g.,* RSA 230:13 (Supp. 2001). Rather, it declares as a matter of legislative policy that all property of a certain class is taken and prescribes the means by which compensation therefor is to be made.

Thus, this case differs from *Gazzola*, in which we found the lack of pre-taking hearing "on the question whether an occasion for the taking of property exists" violated equal protection where such a hearing was "available to those whose land is sought for certain other State government projects." *Gazzola*, 120 N.H. at 29. We resolved the constitutional infirmity in *Gazzola* by reading into the statute at issue a hearing requirement similar to that prescribed for highway takings. *See id.* Such a requirement would have no use in this case, however, because there is no initial individual determination of necessity to review. We conclude that the legislature's interest in avoiding duplicative individual hearings where there is no individual determination to be reviewed passes even the strict scrutiny standard applicable here. Accordingly, we hold that the failure to provide a pre-taking hearing does not violate equal protection and we reverse the trial court's decision to the contrary.

■The plaintiffs also contend that RSA 228:60-a violates equal protection because it arbitrarily exempts from its application railroad rights-of-way that existed before 1969 and have not been in use by a railroad since 1969. *See* RSA 228:60-a, IV. Essentially, the plaintiffs challenge the legislature's decision to take some property in preference to other property; in other words, they question the legislature's conclusion that the taking of certain property would serve a public purpose while the taking of other property would not.

We have not yet examined the issue of whether the decision to take one class of property in preference to another implicates equal protection concerns. It has been stated, however:

> [O]nce it has been determined that the use for which property rights are taken is a public use, and that the taking is necessary for such use, neither a property owner whose property is taken in return for just compensation nor a property owner whose property is not so taken is in a position to claim that he is denied equal protection of the laws.

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."

*Kamrowski v. State*, 142 N.W.2d 793, 797-98 (Wis. 1966) (quoting *Berman v. Parker*, 348 U.S. 26, 35-36 (1954)). We adopt this view and decline to second-guess the wisdom of the legislature on this issue.

Having held that the plaintiffs' due process and equal protection challenges fail, we conclude that the State has taken the railroad right-of-way through the plaintiffs' property in fee simple absolute. We therefore need not address the trial court's ruling regarding the scope of the original easement.

Finally, the State challenges the trial court's award of attorney's fees to the plaintiffs. The trial court based its award of attorney's fees upon its finding that the plaintiffs prevailed on their constitutional challenges to RSA 228:60-a, V, and that they "substantially [benefited] themselves, similarly situated citizens, and the public in general." Because we have reversed the trial court's rulings on the plaintiffs' constitutional claims, we also reverse its award of attorney's fees.

*Reversed.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.